**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NADA HASHEM-YOUNES,

      Plaintiff,

v.                                                                  Case No. 06-CV-15469-DT

DANOU ENTERPRISES, INC., et al,

      Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Pending before the court is an October 23, 2007 motion for summary judgment,

filed by Defendants Danou Enterprises, Inc., Danou LLC # 1, Sam Danou and Barry

Whyte. The matter has been fully briefed and the court conducted a hearing on the

motion on January 9, 2008. For the reasons stated below, the court will grant the

motion.

**I. BACKGROUND**

Unless otherwise noted, the following facts were proffered by Defendants,

admitted by Plaintiff Nada Hashem-Younes, and are therefore undisputed.[1]

Defendant Samir Danou is the owner and Director of the World Trade Center

Detroit/Windsor Languages Institute ("WTCDW"), which has two primary functions: (1)

providing translation services and (2) operating a non-profit school ("School").[2] (Defs.'

Fact ## 6, 9.) The WTCDW was financed by Defendant Danou, and is operated by

_____

[1]Additional facts will be discussed, as necessary, in the Discussion section, *infra*.

[2]Danou also owns Defendant Danou Enterprises, Inc., a management company.
(Defs.' Fact at # 7.)

Defendant Danou, LLC.  (*Id.* at ## 7, 15.)  Defendant Barry Whyte was employed as Deputy Director of the WTCDW and was responsible for overseeing the WTCDW and attempting to secure government contracts.  (*Id.* at ## 8, 46.)

The goal of the translation services portion of the business was to obtain contracts to provide translation services and interpreters.  (*Id.* at # 10.)  Defendant Danou's daughter, Vanessa Danou, was employed by the WTCDW as the Manager of Translation Services and reported to Barry Whyte.  (*Id.* at # 12.)  The WTCDW did not obtain any government contracts until after Plaintiff was terminated, and the only government contracts obtained were for gross amounts of $27,000, $1,200 and $600. (*Id.* at # 11.)

The goal of the School was to train adults with varying levels of competency in Arabic and English to qualify for work as translators or interpreters.  (*Id.* at # 13.)  The School provided courses to adults free of charge.  (*Id.* at # 14.)  Plaintiff worked as Administrator of the School from October 31, 2005 until she was discharged on January 20, 2006.  (*Id.* at ## 40, 110.)  She reported to Barry Whyte.  (*Id.* at # 45.)

Mohsein Al-Meamaar, an Iraqi Muslim, worked as an instructor at the School and performed other duties such as marketing and recruiting.  (*Id.* at # 23.)  In the summer of 2005, Al-Meamaar informed Plaintiff's husband, Majed Younes, that the School was seeking to hire Arabic instructors.  (*Id.* at # 24.)  Thereafter, Majed Younes and Plaintiff went to the WTCDW and met with Samir Danou.  (*Id.* at # 25.)  Plaintiff wears a head covering in the practice of her religion of Islam, and she wore this head covering to her meetings with Defendant Danou.  (*Id.* at # 29.)  Danou therefore believed her to be Muslim.  (*Id.*)  There are differences between an Iraqi Arabic dialect and a Lebanese

Arabic dialect, and Danou believed Plaintiff to be Lebanese because of her dialect. (*Id.* at # 31.) Danou invited Plaintiff to another meeting and told her that there might be a position available that would encompass more than instruction. (*Id.* at # 32.) Specifically, Plaintiff was invited to interview for the Administrator position with Defendants Whyte and Danou. (*Id.* at # 33.)

At that time, University of Detroit-Mercy provided English language instruction for the School and the WTCDW School provided Arabic language instruction. (*Id.* at # 34.) Plaintiff recommended that the School develop a customized Arabic curriculum and told Danou that she would develop a customized curriculum for the School. (*Id.* at # 35.) Plaintiff also discussed with Danou what she could do to bring in grants to provide the WTCDW with funding. (*Id.* at # 38.) Defendant Danou made the decision to hire Plaintiff as Administrator of the School, and Plaintiff began work on October 31, 2005. (*Id.* at ## 39-40.) The School's first semester was already in progress. (*Id.* at # 41.)

Plaintiff was born in the United States, but considers herself to be of Lebanese ancestry. (*Id.* at # 1.) She practices the Muslim religion. (*Id.* at # 2.) Her husband, Majed Younes, was never employed by the WTCDW. (*Id.* at # 5.) When Plaintiff was hired, the School employed the following instructors who were teaching Arabic courses: Al-Meamaar, Iman Radwan Mardini, Mohammed Fradi and Sam Sheikh. (*Id.* at # 42.) All four instructors were Muslim, and Mardini and Sheikh were also Lebanese. (*Id.* at ## 43-44.)

Plaintiff was discharged on January 20, 2006, and Defendant Danou made the decision to discharge her. (*Id.* at ## 109-110.) Defendants allege, and Plaintiff disputes, that Plaintiff was terminated for poor performance. Defendants assert that

Plaintiff was terminated because, among other things, Plaintiff did not fulfill her promises to (1) create an acceptable customized Arabic curriculum; (2) increase enrollment and (3) obtain grants for the School. Plaintiff contends that she was terminated for being female, pregnant, Lebanese and Muslim.

The School has been closed since mid-2006. (*Id.* at # 112.)

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party must first show the absence of a genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the nonmoving party, who "must do more than simply show

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). They must put forth enough evidence to show that there exists a genuine issue to be decided at trial. *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment – the disputed factual issue must be material. *See Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (citation omitted)). A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

### III. DISCUSSION

Defendants seek summary judgment on Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2102 *et seq.*[3] Defendants assert that summary judgment is appropriate because Plaintiff has failed to produce evidence that could establish a *prima facie* case of discrimination. Additionally, Defendants seek summary

---

[3]Defendants also seek summary judgment on Plaintiff's claim under 42 U.S.C. § 1983, because Plaintiff has failed to demonstrate any state action. In response, Plaintiff conceded her § 1983 claim. (Pl.'s Resp. at 13.)

judgment on any claims which Plaintiff assert for hostile work environment or retaliation. Because these two "claims" are related, the court will address them first.[4]

### A.  Hostile Work Environment and Retaliation

### 1.  Hostile Work Environment

First, Defendants seek summary judgment to the extent that Plaintiff asserts a claim for hostile work environment.  While the factual basis for this claim is not clear from the complaint, in Plaintiff's response she appears to rely on her allegation that "Instructor Al Meamaar screamed at Plaintiff and Ms. [Najla] Itani, demeaned them as women, and made gestures like slamming his hand down and jabbing his hand in Plaintiff's face."  (Pl.'s Resp. at 4.)  Plaintiff asserts that "[c]omplaints were made to Defendants, yet nothing was done to stop the problem."  (*Id.*)

 To establish a hostile-work-environment claim, Plaintiff must show that (1) she was a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions.  *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 605 (6th Cir. 2002), abrogated on other grounds by *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232 (6th Cir. 2005).  The Sixth Circuit has held that

> Actionable harassment arises where "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe

---

[4]It is not clear that Plaintiff asserts such claims in her complaint, although she does make passing references to retaliation and an alleged hostile environment.  The court will nonetheless assume for purposes of this motion that Plaintiff has properly asserted claims for hostile work environment and retaliation.

or pervasive to alter the conditions of the victim's employment and create an abusive working environment." In accordance with these elements, a hostile-work-environment claim is cognizable only if the purported harassment, viewed in conjunction with all of the circumstances, occurred because of the employee's protected status.

*Michael v. Caterpillar Fin. Serv. Corp.,* 496 F.3d 584, 600 (6th Cir. 2007).

Plaintiff relies on the alleged conduct of Al-Meamaar in support of her hostile work environment claim. In her deposition, she testified that she observed Al-Meamaar during a placement exam on December 7, 2005 and, in her opinion, he was not properly supervising the students. (Pl.'s Dep. at 134-136.) She witnessed the students talking and told them that their behavior was inappropriate. (*Id.* at 134.) She testified that Al-Meamaar "took it personally" and told her that she should not have said anything because "it's rude, they're adults." (*Id.* at 134.) When she defended her position, Al-Meamaar "went from being shyly [sic] . . . to being loud and talking in a dramatic tone of voice . . . [a]nd then he tells me it happened this time, I will not allow you to disrespect me again." (*Id.* at 137) Plaintiff was "taken aback" by Al-Meamaar's tone and demeanor. (*Id.*) Plaintiff believed that Al-Meamaar, was "embarrassed because he was caught doing something that he should not have been doing." (*Id.* at 139.) Specifically, Plaintiff concluded from his behavior that Al-Meamaar was improperly assisting the applicants on their placement exams. (*Id.* at 139-140.) Plaintiff memorialized her version of this incident in a December 7, 2005 letter to her supervisor, Defendant Whyte. (Defs.' Ex. 25.) The letter states that "if their [sic] was any instance of disrespect that it was coming from [Al-Meamaar] for allowing the applicants to engage in conversation during testing as well as setting a precedent of disorderly conduct in the presence of the applicants." (*Id.*) The letter also includes her view that Al-Meamaar

"was possibly assisting applicants with the test and this is why he became infuriated when I reminded them that there was no talking during testing."  (*Id.*)

Plaintiff also relies on an incident which occurred on December 15, 2005, during a meeting when Al-Meamaar "became irate and started yelling and jabbing his hand." (Pl.'s Dep. at 142.)  While Plaintiff recalls that his hand was "in [her] face" she does not recall what Al-Meamaar said.  (*Id.* at 144.)  She testified that it was "something to the effect of talking or husband or something."  (*Id.*)  Plaintiff further testified that she felt like she was doing her job and nothing was "being done to stop him from doing the things that he's doing."  (*Id.* at 147.)  However, when asked what he was doing she could only generally reply "[w]ell, again, it was a series of events of things that happened.  The incident that I described, the incident that took place on the 7th."  (*Id.*)  Plaintiff "felt like [he] was trying to undermine [her] or get at [her]."  (*Id.*)  Plaintiff further testified, apparently in reference to the December 15 event, "when that big incident happened, it's like what are you going to wait for, him to come and beat the hell out of me before this stops?"  (*Id.* at 147-148.)

Plaintiff also complains about Al-Meamaar's conduct toward her former co-worker, Najla Itani.[5]  When Itani and Plaintiff approached Al-Meamaar about a concern that a student had,[6] Plaintiff contends that he yelled at Itani in the same manner that he

---

[5]The court is not persuaded that Itani's treatment can form the basis of *Plaintiff's* hostile work environment claim.  Nonetheless, the court will address Plaintiff's allegations.

[6]The basis of the student's concern is not entirely clear from Plaintiff's testimony but it appears that the student complained about the grade that Al-Meamaar gave her. The student believed that "if [she] was wearing a shorter skirt or a tighter shirt or something like that, maybe [Al-Meamaar] would have had a change of heart, because she's an older woman."  (Pl.'s Dep. at 154.)  Itani, however, testified that the student

yelled at Plaintiff and that his demeanor was loud and, because he is a big man, scary. (*Id.* at 154-55.) Itani testified that when she approached Al-Meamaar about the grade, he yelled at her and "harassed" her. (Itani Dep. at 32-35.) Although she testified that Plaintiff was not with her when she approached Al-Meamaar, she thought that Plainitff could hear him screaming at Itani. (*Id.* at 35.) Itani believed that Al-Meamaar was "disrespectful" toward her and complained to Defendant Danou about the incident. (*Id.* at 34-35.) She also testified that, after the meeting, Al-Meamaar never yelled at her again, but that he "was disrespectful at [sic] all the time, the way he, like the way he looks at me, the way he treats me like – because, for him, like I think he thought a lady is nothing." (*Id.* at 36.) When asked to confirm that he never actually said that a lady is nothing, Itani testified that "[y]ou know, sometimes you don't have to say things. You can just feel them." (*Id.* at 36.) She did testify, however, that when women spoke up at meetings, Al-Memaar would be irritated and would "hit the table and, you know, get furious and doesn't want to listen to them and always interrupt." (*Id.* at 88.) Itani had a "feeling," based on Defendant Danou's, Al-Maemaar's and her own culture, that a "lot of time men think low of women." (*Id.* at 88.)

Viewing all of this evidence in a light most favorable to Plaintiff, Plaintiff cannot sustain a claim for hostile work environment. Plaintiff cannot show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult," or that the alleged harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,*

---

was not happy about her grade and either Itani or the student believed that she received the grade because she was Chaldean. (Itani Dep. at 31-33.)

510 U.S. 17, 21 (1993) (internal citations omitted).  Instead, the facts of this case are analogous to *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584 (6th Cir. 2007), in which the Sixth Circuit stated that "regardless of whether a shouting match broke out at the meeting and whether [the plaintiff] started it, federal courts are generally not in the business of refereeing such common workplace conflicts." *Id.* at 600-01 (citing with approval *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994) (noting that federal law "does not guarantee a utopian workplace or even a pleasant one . . .  [P]ersonality conflicts between employees are not the business of the federal courts.")).

Actionable harassment must be sufficiently severe to alter the terms and conditions of employment.  *Faragher v. City of Boca Raton* , 524 U.S. 775, 786-88 (1998) (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36-37 (3d ed. 1996) for the proposition that "[d]iscourtesy or rudeness should not be confused with racial harassment" and that "a lack of racial sensitivity does not, alone, amount to actionable harassment").  Further, harassment jurisprudence requires that the court distinguish between harassment and discriminatory harassment. *Trepka v. Bd. of Educ.,* 28 F. App'x 455, 461-62 (6th Cir. 2002) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000)).  Indeed, "harassment motivated by personal dislike for an employee is not actionable under the discrimination laws." *Id.* (citing *St. Mary's Honor Ctr v. Hicks*, 509 U.S. 502 (1993)).  The Supreme Court has explained that "Title VII does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex'", and that "simple teasing . . . offhand comments, and isolated incidents (unless

extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher,* 524 U.S. at 786-788 (internal citations omitted).

The evidence on which Plaintiff relies, which relates solely to the alleged conduct of Al-Meamaar falls far short of actionable harassment. Assuming, as the court must, the veracity of Plaintiff and Itani, they do not describe a workplace permeated with harassment. Instead, they describe isolated incidents of, at worst, an instructor losing his temper. Federal courts, however, are not arbiters of proper workplace behavior. *See id.* at 786-88. If the behavior, as here, does not amount to discriminatory harassment, summary judgment must be granted. Because Plaintiff cannot show that the alleged harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment," *Harris,* 510 U.S. at 21, the court will grant Defendants' motion on this claim.

## 2. Retaliation

Defendants also seek summary judgment on Plaintiff's retaliation claim, which is linked to her hostile work environment claim. The *prima facie* elements of a retaliation claim are similar but distinct from those of a discrimination claim. To establish her prima facie case, Plaintiff must show that

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Michael,* 496 F.3d at 595 (6th Cir. 2007) (citing *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)). The court finds as a matter of law that under the

record facts, as viewed in a light most favorable to Plaintiff, Plaintiff cannot prove either the first or fourth prong of a retaliation claim.

First, there is no evidence that Plaintiff engaged in protected activity under Title VII. Although she complained generally about Al-Meamaar's behavior toward her on December 7, 2005, (Defs.' Ex. 25), nothing in that letter referred to any *discriminatory* conduct.[7] Plaintiff complained that he was disrespectful, but did not state or even imply that Al-Meamaar engaged in any conduct prohibited under Title VII. *See generally Fox v. Eagle Distrib. Co., Inc.,* __ F.3d ___, ___, 2007 WL 4355184, *4 (6th Cir. Dec. 14, 2007) ("[I]n order for Fox's comments to Poplin to be deemed protected activity under the ADEA, Fox must have referenced alleged acts of age discrimination by Eagle."); *Willoughby v. Allstate Ins. Co.,* 104 F. App'x 528, 531 (6th Cir. 2004) (holding that a vague charge of discrimination in an internal letter was insufficient to constitute

_____

[7]During the January 9, 2008 hearing, Plaintiff's counsel raised, for the first time, three additional examples of "protected activity" in which Plaintiff engaged and that purportedly support her retaliation claim. Counsel argues that Plaintiff "complained" that she was directed to hire only Iraqi males, and that she was fired because she complained about this practice. The record does not support this argument. At most, Plaintiff testified that she "tried to bring in a very much competent instructor for the Arabic language" but that Defendant Danou said no because she was Lebanese and told Plaintiff to hire only male Iraqi instructors. (Pl.'s Dep. 160-61.) There is no evidence, however, that Plaintiff *complained* of any such instruction. Moreover, under the causation prong, there is no evidence that her termination was somehow linked to her attempt to hire a Lebanese female. (The court also notes that Defendants indeed hired instructors who were not Iraqi males. (Defs.' Facts. at ## 43-44.).) Additionally, counsel asserted at the hearing that Plaintiff engaged in protected activity by (1) stating that she was pregnant and (2) stating that she was Muslim. These are not the types of protected activity to give rise to a retaliation claim under Title VII. Rather, they form the bases for a disparate treatment claim. Plaintiff does not appear to suggest, nor does the record support, that she was terminated for *stating* that she was pregnant or Muslim, but that she was terminated for being, in fact, pregnant and Muslim. Her argument that she was terminated for her status as pregnant and Muslim is properly addressed (and rejected) in her disparate treatment discrimination claim.

opposition to an unlawful employment practice); *see also CSX Distrib. Serv.,* 68 F.3d

694, 702 (3rd Cir. 1995) ("A general complaint of unfair treatment does not translate into

a charge of illegal age discrimination.").

Further, "[t]o establish the causal connection required in the fourth prong, a

plaintiff must produce sufficient evidence from which an inference could be drawn that

the adverse action would not have been taken had the plaintiff not filed a discrimination

action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). The facts here

are insufficient to give rise to any inference that Plaintiff was fired for either complaining

of Al-Meamaar's behavior toward her on December 7, 2005 or, for that matter, for being

merely present when Itani complained about Al-Meamaar's behavior toward Itani.[8]

Plaintiff has therefore failed to demonstrate the presence of a triable fact and

Defendants are entitled to summary judgment on her retaliation claim.[9]

### B. Discrimination Claims

---

[8]Contrary to Plaintiff's argument at the hearing, the court is not persuaded that
the asserted temporal proximity between her alleged protected activity and discharge is
sufficient to demonstrate causation. Assuming that Plaintiff actually identified protected
activities, their proximity to Plaintiff's discharge does not give rise to a causal
connection. As even the cases on which Plaintiff relies hold: "[T]emporal proximity,
standing alone, is insufficient to establish a causal connection for a retaliation claim."
*Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 718 (6th Cir. 2007) (quoting *Tuttle v.
Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007)). It is true that temporal
proximity, "*[w]hen coupled with evidence of retaliatory conduct*," may establish a causal
connection between protected activity and an adverse employment action. *Id.; see also
Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007). Here, however, Plaintiff has
failed to cite any evidence of retaliatory conduct.

[9]Moreover, even if the court were to find that Plaintiff had established a *prima
facie* case of retaliation under any of Plaintiff's theories, Defendants would nonetheless
be entitled to summary judgment because, pursuant to the court's analysis below, they
have identified legitimate, nonretaliatory reasons for their actions, which Plaintiff has not
rebutted with sufficient proof that raises a genuine issue of material fact as to whether
those reasons were pretextual. *Michael,* 496 F.3d at 596.

Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases. *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Hall v. State Farm Ins. Co.*, 18 F. Supp. 2d 751, 766 (E.D. Mich. 1998). Plaintiff contends that she was terminated for being female, pregnant, Lebanese and Muslim. In order to establish a claim of discrimination, Plaintiff must either present direct evidence of discrimination or indirect, circumstantial evidence. Plaintiff has not provided any direct evidence of discrimination.[10] Therefore, she must establish her case through the burden shifting analysis set forth in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To present a *prima facie* case of discrimination using indirect evidence under the *McDonnell Douglas* framework, Plaintiff must show that (1) she is a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for her position and (4) she was replaced by a person outside the protected class or that a comparable person outside of the class was treated differently. *See Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).[11] If Plaintiff establishes a *prima facie*

---

[10]"In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) (citations omitted).

[11]Plaintiff states that the fourth element of the prima facie case is that the employee was replaced by another person "under circumstances giving rise to an inference of unlawful discrimination," arguing that Defendant incorrectly listed the fourth prong as "similarly situated persons not in the protected class were treated differently." (*See* Pl.'s Resp. at 6.) Sixth Circuit case law, however, allows Plaintiff to establish the fourth element either by showing rather than that she was replaced by a person outside the protected class or that a comparable person outside of the class was treated differently. *See Mitchell*, 964 F.2d at 582.

case of discrimination, the burden of production shifts to the defendant to provide a legitimate, non-discriminatory reason for the employment action. *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004) (citing *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1224 (6th Cir. 1996)). "It is important to note, however, that although the McDonnell Douglas presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507 (1993) (quoting *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). If the defendant provides a legitimate, non-discriminatory reason, the plaintiff must then produce evidence that the defendant's proffered reason is a pretext for discrimination. *Id.*

For summary judgment purposes, Defendants do not appear to dispute that Plaintiff can present a triable issue with respect to prongs (1) and (2). Defendants contend, however, that Plaintiff was not qualified for her position (prong 3) and that she has not identified any similarly situated individuals who were treated differently (prong 4). Additionally, Defendants contend that they have offered a legitimate, non-discriminatory reason for Plaintiff's termination which Plaintiff has not shown is pretextual.

First, the court finds that, with respect to religious discrimination, Plaintiff has failed to identify sufficient facts to create a triable issue with respect to prong 4 because she has failed to identify any similarly situated individuals who were treated differently

than her.[12]  Further, Plaintiff cannot establish a *prima facie* case because there is no dispute that she was replaced by Daniel Huber, who was Muslim.  (Defs.' Fact # 104, accepted by Plaintiff.)[13]

With respect to her claims that she was discharged because of her national origin and sex and because she was pregnant, the court assumes for purposes of this motion that Plaintiff can establish a triable issue of fact material to each prong of her prima facie case.  Nonetheless, the court finds as a matter of law that Plaintiff cannot rebut Defendant's legitimate, non-discriminatory reason for Plaintiff's termination.  Defendants allege that Plaintiff was terminated for poor performance.  Specifically, Defendants assert that Plaintiff was terminated because Plaintiff did not fulfill her promises to (1)

---

[12]In order to be comparable for purposes of a plaintiff's prima facie case, employees must be "similarly situated in all relevant respects."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).  In the disciplinary context, the Sixth Circuit described the analysis as follows:

> [T]o be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell*, 964 F.2d at 583.  Plaintiff intimates that she was treated differently that Defendant Whyte and Al-Meamaar, but it is undisputed that Plaintiff's job duties were different than those of her supervisor, Whyte, and different than those of the instructors, including Al-Meamaar.  (Defs.' Fact # 48, Accepted by Pl.)

[13]There is also no material dispute that Huber was paid $20.00 an hour, the same as Plaintiff.  (Defs. Fact ## 104, Defs.' Ex. 7 at ¶ 17.)  Plaintiff claims that he must have been paid more because he told Plaintiff that he would not leave his prior job unless the WTCDW paid him more than $75,000.  (Pl.'s Dep. at 163.)  Aside from the obvious hearsay implications of this assertion, it does not create a *genuine* issue of fact regarding Huber's pay.  Plaintiff herself admitted that she "cannot say for certain" what Huber was paid.  (*Id.*)

create an acceptable customized Arabic curriculum; (2) increase enrollment and (3) obtain grants for the School. Defendants also rely on Plaintiff's behavior in changing grades after they were submitted to the University of Detroit and her failure to maintain adequate hours. Plaintiff has failed to produce evidence sufficient to persuade a reasonable fact-finder that these reasons were false and pretextual.

"A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Seay v. Tennessee Valley Authority,* 339 F.3d 454, 463 (6th Cir. 2003). "Pretext, however, cannot be shown by attacking the decision itself." *Hein v. All America Plywood Co., Inc.,* 232 F.3d 482, 490 (6th Cir. 2000) (citing *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 898 (6th Cir.1997) (holding that the soundness of an employment decision may not be challenged as a means of showing pretext)).[14]

---

[14]There is some tension between this rule and the three ways to prove pretext, which allow plaintiff to demonstrate pretext by showing that the defendant's preferred reasons are untrue, insufficient, or did not actually motivate the defendant's conduct. It is true that "[a]n employer's business judgment . . . is not an absolute defense to unlawful discrimination." *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 576 (6th Cir. 2003) (citing *E.E.O.C. v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 835 (6th Cir.1997)). Indeed, the Sixth Circuit has held that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.* (citations omitted). In this case, however, there is simply insufficient evidence to withstand summary judgment that Defendants' asserted business reasons were so idiosyncratic as to allow a jury to find that they were pretextual, or to demonstrate that the "'business decision[s were] so lacking in merit as to call into question [their] genuineness." *Bender v. Hecht's Dept. Stores,* 455 F.3d 612, 625 (6th Cir. 2006) (quoting *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996)).

Here, despite Plaintiff's protestations to the contrary, she cannot show that Defendants' reasons were false or pretextual. Plaintiff admits that she told Defendant Danou that she could and would develop a customized Arabic curriculum for the School, and Danou expected her to do so. (Defs.' Facts ## 35, 36, 53.) There is no dispute that although Plaintiff developed constructs and an outline for an Arabic language curriculum, her husband, Majed Younes, "put it from English to Arabic." (*Id.* at # 56.) At least one instructor complained about the curriculum. (*Id.* at # 59; Pl.'s Counter Fact # 59.) Plaintiff further admits that Defendant Danou was very dissatisfied that Plaintiff was unable to develop a curriculum on her own, and that in his opinion the curriculum that was presented by Majed Younes did not meet his expectations or the needs of the School. (Defs.' Fact ## 60 & 61.) Most importantly, there is no dispute that the School did not use the curriculum presented by Majed Younes. (*Id.* at # 62.) While Plaintiff argues that the curriculum was acceptable, she has not submitted sufficient facts to prove that Defendants dissatisfaction with it was so lacking in merit as to be pretextual. Instead, her argument amounts to a challenge to Defendants' business judgment. *See Brocklehurst*, 123 F.3d at 898 ("The soundness of an employer's business judgment, however, may not be questioned as a means of showing pretext." (citation omitted)). Under these facts, Plaintiff cannot show that this reason for terminating her was pretextual.

Similarly, Plaintiff admits that she told Defendant Danou that she would help secure grants to provide WTCDW with funding, (Defs.' Fact # 38), and that he expected her to do so, (*id.* at # 73). She also admits that her job responsibilities included the retention of students, (*id.* at # 70), and that Danou expected her to do so, (*id.* at # 67).

It is undisputed that Plaintiff did not apply for or obtain any grants for the WTCDW, (*id.* at ## 74 & 75), and that there was a steady decline in enrollment between the first semester (when Plaintiff was hired) and the second semester, (*id.* at # 63),.[15] Finally, it is undisputed that it was important for Plaintiff to be in the building when both day and evening classes were being held, but that on multiple occasions she punched out between 3:08 p.m. and 5:33 p.m. (*Id.* at ## 77-79) In various ways, Plaintiff attempts to justify the decline in enrollment and her failure to maintain adequate business hours or obtain grants but, again, she cannot establish pretext by second-guessing Defendants' business judgment.[16] *Brocklehurst*, 123 F.3d at 898. Whether or not Plaintiff can rationalize her performance deficiencies, and whether or not those rationalizations are legitimate, it is nonetheless undisputed that she did not meet her employer's legitimate business expectations.[17]

Finally, Plaintiff has not identified sufficient evidence to establish that Defendants' reliance on the grade incident in deciding to terminate her was pretextual. Both parties devote an inordinate amount of their briefs to a discussion of the grade incident. For contextual purposes only, the "grade incident" can be generally described as follows: after grades were submitted to the University of Detroit, Plaintiff later attempted to

___

[15]Although Plaintiff purports to dispute this fact, she actually disputes only the cause of the decline, not the fact of the decline. (Pl.'s Counter-Fact # 63.)

[16]Plaintiff argues that Whyte also did not obtain grants yet he was not fired. (Pl.'s Resp. at 10.) The court rejects Plaintiff's argument that this somehow establishes pretext because it is undisputed that Whyte, as Plaintiff's supervisor, had different job responsibilities than she did. (Defs.' Fact at # 48.)

[17]Additionally, Plaintiff does not contest that students and teachers complained that Plaintiff spoke to teachers in a condescending manner and treated them like children. (Defs.' Fact # 68).

submit changed grades to the University.  (Defs.' Facts ## 86-89.)  Plaintiff contends

that some of the students complained to her about the grades and she was instructed to

change the grades by Al-Meamaar and Defendant Danou.  It is immaterial whether Al-

Meamaar instructed her to change the grades, as there is no evidence that she, as

Administrator, was obligated to follow his instruction.  And Plaintiff has failed to submit

any *admissible* evidence that Danou instructed her to change the grades because she

relies solely on the inadmissible hearsay testimony of Itani that Plaintiff told Itani that

Danou told Plaintiff to change the grades.  In any event, the undisputed fact is that it

was Plaintiff who submitted the changed grades, which were subsequently rejected by

the University of Detroit.

Additionally, contrary to her assertions, there is no evidence that instructors

were paid differently according to their race, gender or national origin.  Nor is Danou's

alleged question with regard to why Plaintiff, a Shi'ite, couldn't get along with another

Shi'ite evidence of a discriminatory animus toward Muslims.[18]  Plaintiff argues that

Defendants' reasons for her termination were pretextual by generally arguing that

Defendants exhibited discriminatory attitudes with respect to Lebanese, women and

Muslims.  The record, however, simply does not support these allegations. This is

particularly true because of the application of the "same actor inference," which allows

an inference of a lack of discriminatory animus where the same person is responsible

---

[18]Similarly, Itani's "attestation" that Whyte said, "Sam [Danou] hired Jamal and he is Lebanese and that he (Sam Danou) needs to accept that they (Lebanese) are sometimes better" is not sufficient to prove any discriminatory animus.  (*See* Pl.'s Ex. 14.)  Even if admissible, at worst it is only an indication of what Whyte's perception may have been about Danou's beliefs. It is not sufficient to prove any discrimination by Danou himself or by Whyte.

for both hiring and firing the individual.  *Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461 (6th Cir.1995).  As the Sixth Circuit has explained, it "hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." *Hartsel v. Keys*  87 F.3d 795, 804 n.9 (6th Cir. 1996) (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)).  It is undisputed that Samir Danou knew, prior to hiring her, that Plaintiff was Lebanese (due to her dialect), Muslim (due to her head covering) and female.  (Defs.' Facts ## 29 & 31.)  Because Danou made the decision to hire, (Fact # 39), and to fire her, (*id.* at  # 109), the same actor inference applies.[19]  If Danou held a discriminatory animus toward Plaintiff because she was Muslim, Lebanese and female, "very little had happened to change that bias between the time he [hired] her and [terminated] her" a few months later.  *Hartsel*, 87 F.3d at 804 n.9.  And, given the short time between the hiring and firing, the inference becomes even stronger.  *See id.* (citing *Buhrmaster*, 61 F.3d at 464) ("The passage of time between those two events is a relevant factor in weighing the inference.").

In support of her pregnancy discrimination claim, Plaintiff alleges that Vanessa Danou asked Plaintiff, through Christy Asselstine, for a copy of the Arabic curriculum and that she, at one point, said to Defendant Whyte, "let's get something straight, I'm pregnant, not handicapped."  (Pl.'s Facts ## 27 & 28.)  There is nothing even remotely

---

[19]The court recognizes that the same actor inference is not mandatory.  *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 573-574 (6th Cir. 2003) ("We therefore specifically hold that where, as in this case, the factfinder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact.").  In this case, however, Plaintiff has failed to otherwise raise an issue of fact regarding pretext, and the same actor inference is simply further reason for granting Defendants' motion.

discriminatory about Asselstine, or anyone else, asking for a copy of the curriculum. Moreover, although Defendants dispute that Plaintiff made any such statement to Whyte, what she may have said to Whyte simply does not constitute evidence of discrimination by Defendants. Plaintiff fails to point to any discriminatory animus related to her pregnancy.

Finally, Plaintiff also argues that she received positive feedback prior to her discharge, but the Sixth Circuit has rejected such attempts to establish pretext:

> The central theme of Manzer's argument is that, because he continued to receive good performance evaluations and merit pay increases even after the incidents which Diamond Shamrock cited as illustrative of his inaccuracy and combative attitude, those explanations must be incredible. This argument is misdirected. The issue is not whether Manzer was truly "obnoxious" enough, or "unreliable" enough, to justify firing him. Nor are we concerned with why Diamond Shamrock retained Manzer as long as it did. Those are precisely the type of "just cause" arguments which must not be allowed to creep into an employment discrimination lawsuit. Diamond Shamrock asserts that these are the reasons Manzer was fired and, in the absence of one of the three showings discussed above, its explanations must be accepted.

*Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084-85 (6th Cir. 1994); *see also Michael,* 496 F.3d at 599. Fundamentally, Plaintiff's attempts to establish pretext is merely a disagreement with Defendants' business judgment, which is an improper basis by which to establish pretext. As the Sixth Circuit has explained, in a factually similar case:

> Furthermore, Michael's disagreement with the facts uncovered in Caterpillar's investigation does not create a genuine issue of material fact that would defeat summary judgment "as long as an employer has an honest belief in its proffered nondiscriminatory reason." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). The key inquiry in assessing whether an employer holds such an honest belief is "whether the employer made a reasonably informed and considered decision before taking" the complained-of action. *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir.1998). An employer has an honest belief in its

rationale when it "reasonably relied on the particularized facts that were before it at the time the decision was made." *Majewski,* 274 F.3d at 1117 (citation and quotation marks omitted). "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith,* 155 F.3d at 807.

*Michael,* 496 F.3d at 598-99 (6th Cir. 2007). Plaintiff has failed to present evidence that would permit a reasonable jury to conclude that Defendant's legitimate nondiscriminatory reasons were a mere pretext for discrimination. Thus, the court will grant Defendants' motion for summary judgment.[20]

### IV. CONCLUSION

IT IS ORDERED that Defendants' October 23, 2007 motion for summary judgment [Dkt. # 22] is GRANTED.

A separate judgment will issue.

 S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: January 18, 2008

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, January 18, 2008, by electronic and/or ordinary mail.

 S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

---

[20]In light of the court's decision, Defendants' argument related to individual liability becomes moot. Nonetheless, the court agrees with Defendants the individual Defendants are entitled to summary judgment on Plaintiff's Title VII claims because there is no individual liability under Title VII. *See Watham v. General Elec. Co.*, 115 F.3d 400 (6th Cir. 1997).